ORIGINAL

SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FILED-USDC-NDTX-DA
'26 SEP 23 PM3:36

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. |
| v. | |
| DUNCAN JOHN MACDONALD (01)<br>a.k.a. Duncan John<br>a.k.a. DJ<br>SARAH DUREN (02)<br>RICHARD RONALD CAYCE (03)<br>a.k.a. Richard Ronald<br>THOMAS WEICKGENANT (04) | **FILED UNDER SEAL**<br><br>3-26CR-652-O |

# INDICTMENT

The Grand Jury charges:

At all times material to this Indictment:

## Introduction

1. From approximately July 2017 to the date of Indictment, **Duncan John MacDonald**, **Sarah Duren**, **Richard Ronald Cayce**, and **Thomas Weickgenant** (collectively, the "Defendants") engaged in a scheme to defraud the United States through the promotion, sale, and facilitation of a fraudulent tax shelter. The Defendants encouraged high-income individuals ("clients") to illegally evade income taxes by selling those clients so-called copyrighted, irrevocable, complex, non-grantor, discretionary, spendthrift trusts (the "Abusive Trusts"). At the Defendants' direction, clients used the Abusive Trusts to unlawfully shield approximately 90% of their income from taxation. In total, the Abusive Trust scheme illegally sheltered more than $1.5 billion of clients' income from taxation and caused an estimated loss to the United States Treasury

exceeding $200 million. In turn, the Defendants collectively earned millions of dollars in fees selling these Abusive Trusts.

2. The Defendants promoted the Abusive Trusts by making the following fraudulent representations, among others:

a. That clients who purchased Abusive Trusts and assigned their assets and income to those trusts could enjoy the benefit and control of their assets and income without formal ownership and thereby avoid taxation. Specifically, **MacDonald** promoted the trusts to clients and prospective clients by telling them they could "own nothing but control everything." To accomplish this goal, the Abusive Trusts used a nominee creator, or "grantor," to set up the trust, even though the clients made the decision to create the trust, placed their assets in the trust, assigned their income to the trust, and otherwise controlled the administration of the trust.

b. That the Internal Revenue Code permitted clients who assigned their income to the Abusive Trusts to defer taxes on that income in perpetuity.

c. That clients could backdate their Abusive Trusts and file amended income tax returns to obtain tax refunds for prior years using what the Defendants termed "implied law," even though the Defendants knew that the Abusive Trusts did not actually exist in earlier years.

Defendants and Their Entities

3. Defendant **MacDonald** was a resident of Kaufman County, Texas, from at least 2017 until moving to Rockwall County, Texas, in or around May 2019. **MacDonald** often used the names "Duncan John" or "DJ" when promoting the Abusive Trusts to

prevent prospective clients from discovering negative information about him online, including a press release about his conviction and five-year sentence for conspiracy to commit wire fraud arising from a years-long Ponzi scheme.

4. Defendant **Duren** was a resident of Kaufman County, Texas, from at least 2017 until moving to Rockwall County, Texas, in or around May 2019. **Duren** lived with **MacDonald**. Beginning in approximately May 2018, **MacDonald** and **Duren** held themselves out publicly as married.

5. Economic Strategist was the trade name for Asset Cushion, LLC ("Asset Cushion"), one of the businesses the Defendants used to promote and sell the Abusive Trusts. Asset Cushion was organized as a Wyoming LLC on or about October 17, 2012, and registered with the State of Texas on or about February 1, 2019.

6. The Defendants also used Private Asset Services, LLC ("Private Asset Services") and Smarte Holdings, Inc. ("Smarte Holdings") to promote and sell the Abusive Trusts. Private Asset Services was organized as a Texas LLC on or about April 30, 2020, and Smarte Holdings was organized as a Texas corporation on or about May 2, 2022.

7. **MacDonald** was the de facto chief executive of Economic Strategist, Private Asset Services, and Smarte Holdings and exercised significant control over each business, even though he kept his name off corporate registration documents and other official paperwork.

8. **Duren** was the chief administrative officer for Economic Strategist and was involved in the day-to-day operation of the business. **Duren** was sometimes listed on

official paperwork as the owner of Economic Strategist.

9. Economic Strategist Master Trust ("ES Master"), ES Holdings Trust ("ES Holdings"), Versailles Holdings Trust ("Versailles Holdings"), and NCD Holdings Trust ("NCD Holdings") were trusts that **MacDonald** and **Duren** used to receive fees and other income from the promotion and sale of the Abusive Trusts.

10. Defendant **Cayce** was a resident of Lewisville, Texas, from at least 2017 through the date of Indictment. **Cayce** typically used the name "Richard Ronald" when promoting the Abusive Trusts to prevent prospective clients from discovering negative information about him online.

11. **Cayce** operated Benson Financial, LLC ("Benson Financial"), which held and licensed the ostensible copyright to the Abusive Trusts. Benson Financial alternately went by the name Masters Copyrights, LLC ("Masters Copyrights"). **Cayce**, through Benson Financial, received fees from distributors, including Economic Strategist, that sold the Abusive Trusts. In return, **Cayce** licensed distributors to use the copyrighted trust agreements and printed the physical trust documents for clients to sign. **Cayce** also consulted with the Defendants and some clients regarding the operation of the Abusive Trusts.

12. Defendant **Weickgenant** was a resident of Dallas from at least 2017 through approximately August 2020 before moving to Tyler, Texas, in or around August 2020. **Weickgenant** was a tax preparer and an Enrolled Agent, a credential offered by the IRS that permits an individual to represent taxpayers before the IRS. A person can become an Enrolled Agent by obtaining a preparer tax identification number, completing

a suitability check, and passing an online exam. By comparison, to become a Certified Public Accountant ("CPA") in Texas, a person must earn a four-year college degree, complete significant accounting and business coursework, pass a four-part CPA exam, take an ethics course, score above 85% on the professional conduct exam, undergo a criminal background check, and work for one year under the supervision of a licensed CPA.

13. **Weickgenant** was the chief financial officer and chief tax strategist of Economic Strategist from approximately July 2018 through mid-2020. In this role, **Weickgenant** prepared income tax returns for clients and their Abusive Trusts and consulted with clients about the operation of the Abusive Trusts. **Weickgenant** also operated his own business under the name T.E. Weickgenant and Associates, Inc. ("TEW and Associates"), which he used to prepare income tax returns for clients and their Abusive Trusts through at least 2026.

14. Conspirator-1 served as the so-called chief compliance officer for Economic Strategist in or around 2019. Conspirator-1 was an enrolled agent who also operated his own business selling Abusive Trusts.

15. Conspirator-2 and Conspirator-3 were attorneys who owned a personal-injury law firm in Houston, Texas, that worked closely with Benson Financial and the Defendants. Despite having no expertise in tax law, trusts, or estate planning, Conspirator-2 authored letters on law firm letterhead to attempt to convince clients the Abusive Trusts were sound. Conspirator-2 also consulted with the Defendants about the sale of the Abusive Trusts.

Tax Terms and Forms

16. The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for enforcing and administering the tax laws of the United States and collecting taxes owed to the United States Department of the Treasury.

17. Individuals who earned income above a certain threshold were required to file a Form 1040, U.S. Individual Income Tax Return ("Form 1040"). Individuals who owned certain businesses (including LLCs, partnerships, and S Corporations) attached a Schedule E, Supplemental Income and Loss ("Schedule E"), to their Forms 1040 to report the income or loss from those businesses.

18. A Form 1040-X, Amended U.S. Individual Income Tax Return ("Form 1040-X"), was used by individuals to amend their individual income taxes. Individuals who had previously filed a Form 1040 and paid taxes used a Form 1040-X to correct their taxable income and claim a refund, if their corrections resulted in one.

19. A partnership that received income was required to file a Form 1065, U.S. Return of Partnership Income ("Form 1065"). Under the Internal Revenue Code and associated regulations, a domestic LLC with at least two members was classified as a partnership for federal income tax purposes unless it elected to be treated as a corporation.

20. A business electing to be treated as an S Corporation was required to file a Form 1120-S, U.S. Income Tax Return for an S Corporation ("Form 1120-S").

21. A partnership filing a Form 1065 and a corporation filing a Form 1120-S

passed their income, losses, deductions, and credits on to the partners or shareholders, respectively, for federal income tax purposes. A Schedule K-1 was an IRS form which was attached to a Form 1065 and Form 1120-S and which was used to report a partner or shareholder's share of income, losses, deductions, and credits.

22. A domestic trust that was taxable under the Internal Revenue Code and associated regulations was required to file a Form 1041, U.S. Income Tax Return for Estates and Trusts ("Form 1041"). When a beneficiary of the trust received a taxable distribution from the trust, that distribution was reported on a Schedule K-1 attached to the Form 1041.

23. An Employer Identification Number ("EIN") was a unique identifier that the IRS assigned to certain businesses for identification purposes on income tax returns and other documents. A Form SS-4, Application for Employer Identification Number ("Form SS-4"), was used by employers, corporations, partnerships, trusts, and other entities to apply for an EIN.

Definitions and Tax Rules for Trusts

24. A trust was a legal instrument by which one person took legal title to property for the purpose of protecting and conserving it for another person. Trusts were formed under state law, generally either by a will or by the signing of a trust agreement (also called a trust instrument).

25. A trust involved three distinct parties: a grantor (also called a settlor), a beneficiary, and a trustee. A grantor (or settlor) was the creator of the trust who conveyed money or other property to the trust and thereby relinquished legal title. A beneficiary

benefitted from the property conveyed to the trust. A trustee managed the property for the benefit of the beneficiary.

26. The Abusive Trusts promoted by the Defendants included a fourth party not cognizable under the law: the so-called compliance overseer. According to the Defendants, a compliance overseer exercised authority and control over the trustee and could replace the trustee at will.

27. Generally speaking, trusts were separate legal entities subject to federal income tax. All income received by a trust was taxable unless specifically exempted by the Internal Revenue Code. Depending on the type of trust, either the grantor, the trust, or the beneficiary had a duty to pay federal income tax on the trust income.

28. A grantor trust was a trust over which the grantor retained the power to control the trust's income and assets. When the grantor retained control of the trust assets, the income of the trust was taxed to the grantor, meaning that the grantor had a duty to report such income on the grantor's Form 1040 and pay any federal income tax owed on that income.

29. A non-grantor trust was a trust over which the grantor did not retain the power to control the trust's income and assets and instead conveyed that power to an independent trustee. The income of a non-grantor trust was taxable to the trust itself, meaning the trustee was required to file a Form 1041 and pay, from the assets of the trust, any income taxes owed by the trust. For non-grantor trusts, the amount of taxes owed depended on how much of the trust's income was distributed to the beneficiaries. Non-grantor trusts could deduct from their income Distributable Net Income ("DNI"), which

included the amounts paid, credited, or required to be distributed to the trust's beneficiaries. In turn, distributions from the trust to a beneficiary were taxable to that beneficiary, meaning that the beneficiary had a duty to report the distribution as income on the beneficiary's tax return and pay any federal income tax owed on that distribution. Section 643 of the Internal Revenue Code and associated regulations determined what income to a non-grantor trust was taxable to the trust and what was taxable to the beneficiary.

30. When the IRS determined that a trust lacked economic substance, the IRS deemed the trust to be a sham and reassigned the trust's income to the grantor. The grantor was then responsible for reporting the trust's income on a Form 1040 and paying the taxes on that income. The Internal Revenue Code defined any transaction, such as creating a trust, as lacking economic substance: (1) if the transaction failed to change the taxpayer's economic position apart from federal income tax effects, or (2) if the taxpayer had no substantial purpose—apart from tax avoidance—for entering the transaction.

31. A taxpayer could request a private letter ruling ("PLR") from the IRS to establish certainty regarding the federal tax consequences of a particular transaction. A PLR would be issued to the taxpayer who requested it and would be binding on the IRS if the taxpayer's request had fully and accurately described the proposed transaction and if the taxpayer carried out the transaction as described. Other taxpayers could not rely on a PLR as binding precedent for their transactions, however.

Notice to Defendants Concerning Problems with the Abusive Trusts

32. On the following occasions, among others, certain Defendants received

notice from independent professionals that the Abusive Trusts did not operate as the Defendants claimed and that their scheme was illegal:

a. On or about March 8, 2018, **MacDonald** received a forwarded email from a trust and estate planning attorney questioning the claims that the Defendants were making about the Abusive Trusts. The attorney pointed out that "[w]ith this Trust being a 'non-grantor' trust, it is its own taxpayer. Therefore, any income generated by the assets owned by the trust will hit the highest income tax rate at about $13K in income[.]" **MacDonald** forwarded the email to **Cayce** for his review.

b. On or about November 16, 2018, **MacDonald** received a forwarded email from a CPA who attended a presentation on the Abusive Trusts. The CPA wrote a prospective client, who was considering the Abusive Trusts: "My professional recommendation is to not pursue this method of tax avoidance/evasion any further. I cannot emphasize enough that I believe every significant tax savings/deferment technique described in the presentation are [*sic*] illegal or inaccurate uses of the Federal tax code." The CPA then went on to note numerous issues that he saw with the Abusive Trusts, including:

i. Nothing in the Internal Revenue Code supported the use of the Abusive Trusts to avoid/defer income;

ii. The Abusive Trust was not backed by meaningful citations to court cases, the Internal Revenue Code, associated regulations, or other authority; and

iii. The cost of the Abusive Trust was quite high for something that lacked authority.

**MacDonald** forwarded the CPA's email to **Weickgenant** with a note: "Need your thoughts to assisting [*sic*] me with some of this …"

c. On or about February 11, 2019, **MacDonald** and Conspirator-1 received a forwarded email from another CPA who attended a presentation on the Abusive Trusts. The CPA had written to T.L., a client of the Abusive Trusts: "After reviewing the documents that have been sent to me and after reviewing these documents with three others CPA's [*sic*] we are all in agreement that this Trust is not a good situation." She concluded that "my opinion is you should look at all of this and reconsider your involvement with [Economic Strategist]." She highlighted several problems she saw with the Abusive Trusts, including "the very problematic aspects of someone either ceding control over their assets to someone else in a legitimate irrevocable manner or having control and basically establishing what would amount to a grantor trust (disregarded for tax purposes)." To bolster her point, the CPA attached a document from the IRS website—also forwarded to **MacDonald**—which was entitled "Abusive Tax Evasion Schemes – Talking Points" and which reviewed and debunked a series of false claims abusive trust promoters often make.

d. On or about February 14, 2019, **MacDonald** and Conspirator-1 received a forwarded email from a dual CPA–attorney who had reviewed promotional materials on behalf of a prospective client of the Abusive Trusts. The CPA–attorney warned the prospective client: "We are still resolute with our concerns regarding this strategy. Specifically, the open issue remains the lack of any specific guidance (e.g., a private letter ruling) that fits our fact pattern so as to give us comfort."

e. On or about March 1, 2019, **MacDonald** and **Weickgenant** received a forwarded email from a tax attorney who had reviewed the Abusive Trusts for a prospective client. The tax attorney warned: "There are dozens of red flags here, nothing really adds up to me. … [T]he copyrighted trust is a non-grantor trust, which means **any trust income over $12,500 will be taxed at the highest income tax rates**. I don't understand what he is buying and why it costs $425k."

f. On or about March 4, 2019, Conspirator-1 and Employee-1, an employee of Economic Strategist, received a forwarded email from a tax attorney who had reviewed the Abusive Trusts on behalf of trust client T.L. The tax attorney explicitly warned T.L.: "It remains my very strong recommendation to take steps to rectify the situation and to mitigate your criminal exposure. It is also my strong recommendation that you not be involved in any future sale of one of these trusts or in any transaction related to one." Employee-1 communicated this warning to **MacDonald**.

g. On or about June 24, 2019, **MacDonald**, **Weickgenant**, and Conspirator-1 received a forwarded email from a tax attorney who had reviewed the Abusive Trusts on behalf of a prospective client. The tax attorney offered his assessment of the Abusive Trusts:

> It's tax fraud and those provision don't allow for tax free gains. While there are many claims in these documents [from the Abusive Trusts], the most relevant tax claims are that (1) these types of trusts are not subject to income taxes when all income is designated to corpus or as extraordinary dividends, (2) these trusts are not subject to capital gains taxes when assets or properties are sold, (3) there is [*sic*] no gift taxes due when assets are transferred to the trust, and (4) it is not illegal to take these positions. All of these claims are false. None of the cases or laws cited in the documents support these claims. These are not new claims. In our practice, we come across these types of

> documents periodically. … These systems will have documents, opinions, and citations that make it sound legitimate, but it is absolutely not. … This is a scam.

h. On a date in or about 2019, **MacDonald** received a legal memorandum from a tax attorney to a client of the Abusive Trusts reviewing one of the client's trusts. The tax attorney wrote:

> The Economic Strategist materials repeatedly, and incorrectly, describe Internal Revenue Code ("IRC") § 643 as a deferral and/or exclusion provision. What IRC § 643 actually does is require a trust, rather than the beneficiary, to pay the tax on specific items of income, such as extraordinary dividends and capital gains, regardless of distributions, in certain scenarios. In no uncertain terms are extraordinary dividends or capital gains excluded (or even deferred) from income taxation under IRC § 643.

33. Additionally, certain Defendants received notice on the following occasions, among others, that the IRS considered the Abusive Trust to be an illegal tax shelter:

a. On or about November 5, 2019, Employee-1 informed **MacDonald** that Conspirator-1, T.L., and T.L.'s CPA had spoken on the phone with an attorney from the IRS Office of Chief Counsel, which provides legal guidance and interpretive advice to the IRS and taxpayers. Employee-1 told **MacDonald** that the IRS attorney, who had reviewed T.L.'s request for a PLR, had concluded that the Abusive Trust described in the PLR was a taxable trust.

b. On or about May 20, 2020, an IRS revenue agent who was auditing the tax returns for J.H., an Abusive Trust client, told **Weickgenant** that the Internal Revenue Code did not allow an Abusive Trust to deduct its income as an extraordinary dividend and thereby avoid paying taxes.

c. On or about March 11, 2021, **Weickgenant** received faxed correspondence from another IRS revenue officer, who was auditing the tax returns for W.B., an Abusive Trust client. The IRS revenue officer concluded that W.B. was liable for a civil fraud penalty because, among other reasons, the Abusive Trust lacked economic substance and was, therefore, a sham intended to avoid income taxes.

34. On or about August 2, 2022, IRS – Criminal Investigation ("IRS-CI") special agents executed a search warrant at **MacDonald** and **Duren's residence**. During the execution of the search warrant, IRS-CI special agents interviewed **MacDonald** and **Duren** and informed them about the criminal investigation. IRS-CI special agents asked **MacDonald** questions about the Abusive Trusts and Economic Strategist, and **MacDonald** repeatedly made false statements.

35. On or about August 2, 2022, IRS-CI special agents executed a search warrant at **Weickgenant's** residence. During the execution of the search warrant, IRS-CI special agents informed **Weickgenant** that the search warrant was part of a criminal investigation into Economic Strategist and the tax returns that **Weickgenant** filed for the Abusive Trusts.

Count One
Conspiracy to Defraud the United States
(Violation of 18 U.S.C. § 371)

36. Paragraphs 1 through 35 of this Indictment are realleged and incorporated as if set forth fully herein.

37. Beginning in or about July 2017 and continuing until on or about September 22, 2026, in the Northern District of Texas and elsewhere, defendants **MacDonald**, **Duren**, **Cayce**, **Weickgenant**, Conspirator-1, Conspirator-2, and Conspirator-3, together with others known and unknown to the Grand Jury, knowingly conspired and agreed to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, namely, federal income taxes.

Manner and Means

38. The conspiracy operated, and would operate, in substance, as follows:

39. **MacDonald**, **Cayce**, and **Weickgenant** would market the Abusive Trusts on websites, YouTube shows, and radio programs, as well as through in-person and virtual seminars. In their marketing presentations and materials, the Defendants would fraudulently claim that clients could defer payment of taxes in perpetuity, thereby eliminating taxes on approximately 90% of their non-wage income.

40. **MacDonald** and **Weickgenant** would instruct clients of the Abusive Trusts to set up at least two sham trusts and assign approximately 90% of their non-wage income and/or the ownership interest in their businesses to one of those trusts to generate the illusion that the trusts—not the clients—earned the income and/or owned the

businesses. The first sham trust then would distribute its purported income to one or more additional sham trusts, which reported deductions matching or exceeding their purported income. In this way, clients would unlawfully avoid paying income taxes on approximately 90% of their non-wage income.

41. **MacDonald** would assure prospective clients that, even though they were nominally giving up ownership of their assets and income, they could continue to control and benefit from those same assets and income without any tax consequences.

42. The Defendants would hire and train employees and agents to assist in promoting, creating, selling, administering, and servicing the Abusive Trusts.

43. **MacDonald** would pay referral fees to clients and others for recruiting new clients to purchase the Abusive Trusts.

44. **MacDonald** would tell clients of the Abusive Trusts that they would be purchasing a bespoke legal instrument tailored specifically to their needs and priced on the complexity of their financial situation. In fact, the clients would receive nearly identical Abusive Trusts.

45. In an effort to undercut the advice of independent professional advisors, **MacDonald**, **Cayce**, and **Weickgenant** would claim that CPAs, attorneys, and tax professionals unaffiliated with the Abusive Trusts did not understand the structure and transactions and were not privy to certain portions of the Internal Revenue Code and regulations.

46. **MacDonald** would represent to clients and prospective clients of the Abusive Trusts that "implied law" meant they could backdate the formation of their sham

trusts to when they first started thinking about protecting their assets. **MacDonald** also would represent to clients and prospective clients that they could file amended tax returns to claim income tax refunds for years when their sham trusts had not yet been established and, therefore, did not exist.

47. **MacDonald** would tell prospective clients that, by purchasing the Abusive Trusts, they would have all their estate planning needs provided, including tax preparation, audit representation, and advice on how to use the Abusive Trusts, at no additional cost. In fact, clients were often charged for these services, if they were even provided at all, and clients frequently had difficulty getting in touch with the Defendants once they had purchased the Abusive Trusts.

48. **MacDonald** would charge clients between approximately $20,000 to more than $100,000 to purchase the Abusive Trusts. **MacDonald** would attempt to justify the cost of the Abusive Trusts by comparing the price to what prospective clients stood to evade in taxes. **MacDonald** and **Duren** would direct clients to wire the purchase funds to Economic Strategist, Private Asset Services, Smarte Holdings, or other bank accounts they controlled.

49. **MacDonald** and **Duren** would cause funds to be wired to Benson Financial for each Abusive Trust a client purchased. **Cayce** then would cause the preparation and printing of purported trust agreements to create the sham trusts used to carry out the Abusive Trust scheme.

50. **Cayce** would cause Benson Financial to provide a letter of assurance from Conspirator-2 concerning the Abusive Trusts. The Defendants used this letter to try to

convince prospective clients that the Abusive Trusts could legally avoid income taxes. Conspirator-2 and Conspirator-3, who co-owned a law firm with Conspirator-2, also would benefit financially from the sale of Abusive Trusts through Benson Financial.

51. **MacDonald** would direct clients to use **Weickgenant** or other tax return preparers affiliated with the Abusive Trusts to file tax returns and dissuade clients from using their own tax return preparers or CPAs to file tax returns for the Abusive Trusts.

52. **Weickgenant** would direct clients of the Abusive Trusts to pay TEW and Associates for the preparation of tax returns and for representation in IRS audits.

53. **Weickgenant** would prepare and file false Forms 1040 and Forms 1041 for clients of the Abusive Trusts. **Weickgenant** also would prepare and file false Forms 1040-X for some clients of the Abusive Trusts and claimed income tax refunds on their behalf for years prior to when they had formed a sham trust.

54. **Weickgenant** would discourage clients from complying with IRS revenue agents who were attempting to audit the clients for their participation in the Abusive Trusts.

55. The Defendants would and did take action to conceal their crimes and avoid detection by the IRS.

56. Between 2018 and 2023, **MacDonald** and **Duren** received approximately $8,005,176 in fees from the promotion and sale of Abusive Trusts, most of which they transferred to ES Holdings and Versailles Holdings.

Overt Acts

57. On or about the following dates, in furtherance of the conspiracy, at least

one of the Defendants and their conspirators committed and caused to be committed the following overt acts in the Northern District of Texas and elsewhere, among others, listed below:

Client J.H.

58. In or about January 2019, **MacDonald** told J.H. that "Joe Blow" at Economic Strategist could be the grantor for J.H.'s Abusive Trust so that it would appear that "it was never [J.H.'s] brain thought" and that "there was no purpose or reason that [the trust] was created with regard to [J.H.]" **MacDonald** assured J.H. that once the sham trust was established, the nominee grantor would have no way to control the assets of the trust, over which J.H. would retain exclusive control.

59. In or about January 2019, **MacDonald** told J.H. that the Abusive Trusts were reviewed by "enrolled agents of the Internal Revenue Service that work [at Economic Strategist]. They're at the highest levels of the IRS and they work here." **MacDonald** told J.H. that by using enrolled agents who are "part of the Internal Revenue Service," tax returns for the Abusive Trusts would be submitted as an "audited statement straight into the Internal Revenue Service."

60. In or about January 2019, **MacDonald** told J.H. that, using the Abusive Trusts, he would not need to pay taxes on his non-wage income. Nevertheless, **MacDonald** advised J.H. that he should "be conservative" and pay taxes on 10% of his income, even though "technically, it's a zero tax return," because "pigs get fat, hogs get slaughtered."

61. In or about January 2019, **MacDonald** assured J.H. that he could transfer

his assets, including his homes and cars, to the Abusive Trusts and continue to use those assets as if he still owned them and that J.H. could spend money out of the sham trust without tax consequences by claiming that the transaction was a loan.

62. In or about January 2019, **MacDonald** acknowledged to J.H. that "tax motivated strategies don't work with the Internal Revenue Service. It's got to be a business motivated strategy, not a tax motivated strategy." However, **MacDonald** told J.H. that the Abusive Trust had a non-tax, business purpose and claimed that the trust was "not [established for] the purpose to defer tax, not for the purpose to do anything with tax. It's just that you're fortunate, or the trust is, that … [income] stays in corpus as a zero."

63. In or about January 2019, **MacDonald** told J.H. that he could use "implied law" to do a "reach back"—filing an amended return to obtain a tax refund by backdating the Abusive Trusts to years before J.H. established his sham trusts. **MacDonald** estimated that J.H. could receive a tax refund of approximately $300,000 from the IRS.

64. On or about January 30, 2019, **MacDonald** caused J.H. to wire $142,500 to a bank account ending x5838 in the name of Economic Strategist Master Trust, on which **Duren** was the sole authorized signer.

65. On or about February 7, 2019, **MacDonald** caused EINs to be registered with the IRS for two Abusive Trusts on behalf of J.H.

66. On or after February 7, 2019, **MacDonald** caused J.H. to receive trust agreements for the Abusive Trusts, with **Duren** serving as the grantor of one of these sham trusts, J.H. Trust-1, and an employee of Economic Strategist served as the grantor

for the other, J.H. Trust-2.

67. On or after February 7, 2019, **Duren**, J.H., and the Economic Strategist employee backdated their signatures on the trust agreements agreement to January 3, 2016.

68. On or after February 7, 2019, **MacDonald** caused J.H. to transfer his real estate, cars, and other property to J.H. Trust-1 and J.H. Trust-2.

69. On or about February 15, 2019, **MacDonald** caused J.H. to receive a trust agreement for a third Abusive Trust, J.H. Trust-3 and caused J.H. to backdate his signature to January 3, 2016.

70. On or about February 11, 2019, **Weickgenant** caused J.H. to wire $9,000 to a bank account ending x2315 in the name of TEW and Associates for tax preparation services.

71. On or about April 3, 2019, **Weickgenant** prepared and filed a 2016 Form 1040-X for J.H. claiming a $103,750 income tax refund, which **Weickgenant** falsely explained was due to “changes in business income.”

72. On or about April 3, 2019, **Weickgenant** prepared and filed a 2017 Form 1040-X for J.H. claiming a $58,735 income tax refund, which **Weickgenant** falsely explained was due to “changes in business income.”

73. On or about October 15, 2019, **Weickgenant** prepared and filed 2018 Forms 1041 for J.H. Trust-1, J.H. Trust-2, and J.H. Trust-3. The 2018 Form 1041 for J.H. Trust-3 fraudulently claimed $47,247 in “management fees” from J.H.’s businesses, all of which it deducted as an income distribution. On the attached Schedules K-1,

**Weickgenant** reported half the distribution to J.H. Trust-1 and half to J.H. Trust-2. On the 2018 Forms 1041 for J.H. Trust-1 and J.H. Trust-2, **Weickgenant** fraudulently deducted the total amount of the distribution purportedly received as an "other deduction" for "extraordinary dividends allocated to corpus."

74. On or about October 15, 2019, **Weickgenant** prepared and filed a 2018 Form 1040 for J.H. that fraudulently reduced his total income by assigning a portion of J.H.'s income to his Abusive Trusts and deducting that amount in full.

75. On or about May 20, 2020, **Weickgenant** met with an IRS revenue agent, who was auditing J.H.'s income tax returns to determine whether to assess additional taxes based on J.H.'s use of the Abusive Trusts. During that meeting, **Weickgenant** falsely represented that the Abusive Trusts were formed in 2016 and that J.H. had conveyed all his property to the trust in 2016.

Client R.S.

76. In or about December 2018, **MacDonald** told R.S. that R.S. would receive over $400,000 in tax refunds by using the Abusive Trusts.

77. In or about January 2019, when R.S. mentioned consulting an independent lawyer about the Abusive Trusts, **MacDonald** texted R.S.: "[O]ur Attorneys and Enrolled Agents (IRS) who work for us will be addressing your legal or tax needs[.] … [I]t's impossible for any Certified Tax/Trust Attorney to say anything negative [about the Abusive Trusts]."

78. On or about January 4, 2019, **MacDonald** caused R.S. to wire $59,250 to a bank account ending x5838 in the name of Economic Strategist Master Trust, on which

**Duren** was the sole signer, for the purchase of Abusive Trusts.

79. On or about January 10, 2019, **MacDonald** caused R.S. to wire $59,250 to a bank account ending x5838 in the name of Economic Strategist Master Trust, on which **Duren** was the sole signer, for the purchase of Abusive Trusts.

80. On or about January 18, 2019, **MacDonald** caused EINs to be registered with the IRS for three Abusive Trusts on behalf of R.S.

81. On or after January 18, 2019, **MacDonald** caused R.S. to receive trust agreements for the Abusive Trusts backdated to January 4, 2016.

82. On or about February 26, 2019, **Weickgenant** caused R.S. to write a $9,050 check payable to **Weickgenant** for tax preparation services.

83. On or about May 30, 2019, **Weickgenant** prepared and filed a 2016 Form 1040-X for R.S. claiming a $12,386 income tax refund, which **Weickgenant** falsely explained was due to "reporting additional expenses not previously reported."

84. On or about October 4, 2019, **Weickgenant** prepared and filed a 2017 Form 1040-X for R.S. claiming a $346,268 income tax refund, which **Weickgenant** falsely explained was due to "changes in Schedule E … due to expenses not previously booked."

85. On or about March 11, 2020, **Weickgenant** met with an IRS revenue agent who was auditing R.S.'s income tax returns to determine whether to assess additional taxes based on R.S.'s use of the Abusive Trusts. During that meeting, **Weickgenant** falsely represented that the Abusive Trusts were formed in 2016 and thereafter provided management services to R.S.'s businesses in return for a fee.

Client J.D.

86. On or about July 30, 2019, **MacDonald** spoke with client J.D. and one other individual over the phone to promote the Abusive Trusts.

87. On or about September 12, 2019, **MacDonald** met with J.D. in person to promote the Abusive Trusts.

88. On or about November 13, 2019, **Duren** emailed J.D., copying **MacDonald**, with instructions to wire Economic Strategist funds to purchase the Abusive Trusts.

89. On or about November 13, 2019, J.D. wired $62,500 to a bank account ending x2224 in the name of Asset Cushion.

90. On or about November 25, 2019, **MacDonald** caused EINs to be registered with the IRS for two Abusive Trusts on J.D.'s behalf: J.D. Trust-1 and J.D. Trust-2.

91. On or after November 25, 2019, **MacDonald** caused J.D. to receive trust agreements for both trusts.

92. On or about the following dates, **Weickgenant** prepared and filed false Forms 1041 for J.D.'s Abusive Trusts that assigned the bulk of J.D.'s business income to J.D. Trust-1, distributed the income to J.D. Trust-2, and then fraudulently deducted the entirety of that income on J.D. Trust-2:

| Overt Act | Sham Trust | Year | Approx. Filing Date | Falsity |
|---|---|---|---|---|
| a | J.D. Trust-1 | 2019 | 12/08/2020 | Assigning J.D.'s Sch. E income to the sham trust |
| b | J.D. Trust-2 | 2019 | 12/08/2020 | Deducting all the assigned income |
| c | J.D. Trust-1 | 2020 | 8/12/2021 | Assigning J.D.'s Sch. E income to the sham trust |
| d | J.D. Trust-2 | 2020 | 8/12/2021 | Deducting all the assigned income |
| e | J.D. Trust-1 | 2021 | 10/06/2022 | Assigning J.D.'s Sch. E income to the sham trust |

| | | | | |
|---|---|---|---|---|
| **f** | J.D. Trust-2 | 2021 | 10/06/2022 | Deducting all the assigned income |
| **g** | J.D. Trust-1 | 2022 | 10/02/2023 | Assigning J.D.'s Sch. E income to the sham trust |
| **h** | J.D. Trust-2 | 2022 | 10/02/2023 | Deducting all the assigned income |
| **i** | J.D. Trust-1 | 2023 | 9/30/2024 | Assigning J.D.'s Sch. E income to the sham trust |
| **j** | J.D. Trust-2 | 2023 | 9/30/2024 | Deducting all the assigned income |

93. On or about May 1, 2024, **Weickgenant** faxed a signed letter to an IRS revenue agent who was auditing J.D.'s Abusive Trusts, claiming: "I have been advised by my legal advisors that I do not have the authority to discuss any items regarding this Spendthrift trust," and refused to provide information regarding the trusts.

94. On or about May 14, 2024, **Weickgenant** emailed J.D. and instructed him not to contact anyone from the IRS or speak with anyone from the IRS who may contact him.

95. On or about November 17, 2024, **Weickgenant** instructed J.D. by email that he did not need to attend a scheduled interview with the IRS, even though J.D. had received a summons from the IRS compelling his attendance and testimony.

96. On or about August 6, 2025, **Weickgenant** emailed J.D. and other clients of the Abusive Trusts that the IRS had determined their trusts were grantor trusts subject to taxation. **Weickgenant** told clients, including J.D., that it was critical they receive a "debrief" and remedy the issue by enrolling in a so-called "RAPTOR" system to avoid facing consequences from the IRS, including possible criminal charges. **Weickgenant** proposed clients pay up to $30,000 to enroll in RAPTOR.

<u>Client K.S.</u>

97. In or about 2019, **MacDonald** met with client K.S. in Dallas to promote the Abusive Trusts.

98. On or about August 20, 2019, **Duren** emailed K.S. a payment receipt for a $20,000 wire transfer toward the purchase of Abusive Trusts.

99. On or about November 21, 2019, **Weickgenant** prepared a "Tax Return Analysis," which showed how much of an income tax refund K.S. could expect to receive for tax years 2016 through 2018 if he filed amended income tax returns using the Abusive Trusts. **Weickgenant's** analysis indicated that K.S. would receive an income tax refund of up to approximately $78,000 each year for 2017 and 2018 and of up to approximately $21,000 for 2016.

100. On or about November 26, 2019, **MacDonald** caused K.S. to wire an additional $40,000 to an account ending x2224 in the name of Asset Cushion to purchase the Abusive Trusts.

101. On or about April 17, 2020, following a dispute with Economic Strategist, **MacDonald** caused K.S. to wire a further $8,750 to an account ending x2224 in the name of Asset Cushion to purchase the Abusive Trusts.

102. On or about May 19, 2020, **Cayce** caused the mailing of K.S.'s Abusive Trust agreements to Economic Strategist and notified **Duren** of the mailing.

103. On or about the following dates, **Weickgenant** prepared and filed false Forms 1041 for K.S.'s Abusive Trusts that assigned the bulk of K.S.'s business income to K.S. Trust-1, distributed the income to K.S. Trust-2, and then fraudulently deducted the entirety of that income on K.S. Trust-2:

| Overt | Sham Trust | Year | Approx. | Falsity |
|---|---|---|---|---|

| Act | | | Filing Date | |
|---|---|---|---|---|
| a | K.S. Trust-1 | 2018 | 8/30/2020 | Assigning K.S.'s Sch. E income to the sham trust |
| b | K.S. Trust-2 | 2018 | 8/30/2020 | Deducting all the assigned income |
| c | K.S. Trust-1 | 2019 | 1/22/2021 | Assigning K.S.'s Sch. E income to the sham trust |
| d | K.S. Trust-2 | 2019 | 1/22/2021 | Deducting all the assigned income |
| e | K.S. Trust-1 | 2020 | 10/15/2021 | Assigning K.S.'s Sch. E income to the sham trust |
| f | K.S. Trust-2 | 2020 | 10/15/2021 | Deducting all the assigned income |
| g | K.S. Trust-1 | 2021 | 9/30/2022 | Assigning K.S.'s Sch. E income to the sham trust |
| h | K.S. Trust-2 | 2021 | 9/30/2022 | Deducting all the assigned income |
| i | K.S. Trust-1 | 2022 | 10/2/2023 | Assigning K.S.'s Sch. E income to the sham trust |
| j | K.S. Trust-2 | 2022 | 10/2/2023 | Deducting all the assigned income |

104. On or about the following dates, **Weickgenant** prepared and filed K.S.'s Forms 1040, which falsely claimed only a fraction of the income that K.S. and his wife earned from their businesses:

| Overt Act | Taxpayer | Year | Approx. Filing Date | Falsity |
|---|---|---|---|---|
| a | K.S. & P.S. | 2018 | 8/30/2020 | Schedule 1, Line 12 – Business Income; Line 6 – Total Income |
| b | K.S. & P.S. | 2019 | 1/22/2021 | Schedule 1, Line 12 – Business Income; Line 6 – Total Income |
| c | K.S. & P.S. | 2020 | 5/18/2022 | Schedule 1, Line 3 – Business Income<br>Line 9 – Total Income |
| d | K.S. & P.S. | 2021 | 10/17/2022 | Schedule 1, Line 3 – Business Income<br>Line 9 – Total Income |
| e | K.S. & P.S. | 2022 | 10/16/2023 | Schedule 1, Line 3 – Business Income<br>Line 9 – Total Income |

105. In or about January 2024, after being engaged to represent K.S. during an IRS audit, **Weickgenant** instructed K.S. repeatedly not to speak to the IRS or respond to IRS summonses, even after a court ordered K.S. to do so.

106. On or about January 28, 2025, **Weickgenant** instructed K.S. to take the following steps to obstruct a show cause hearing before a United States District Court,

which the court had ordered to enforce the IRS's summons to K.S.: **Weickgenant** sent K.S. a script with frivolous legal arguments to read aloud and to physically hand to the judge during the hearing and provided K.S. with a frivolous "Non-Disclosure Agreement," which **Weickgenant** had signed and instructed K.S. to sign and file with the court, that purported to explain why K.S. could not respond to the IRS's summons without subjecting himself to legal consequences.

<u>Client T.L.</u>

107. On or about September 20, 2018, **MacDonald** met with client T.L. to promote the Abusive Trusts.

108. On or about September 25, 2018, **MacDonald** caused T.L. to write a $40,000 check to Economic Strategist to purchase the Abusive Trusts. **Duren** deposited the two checks to an account ending x5838 in the name of Economic Strategist Master Trust.

109. On or about October 3, 2018, **MacDonald** caused T.L. to write a $40,000 check to Economic Strategist to purchase the Abusive Trusts. **Duren** deposited the two checks to an account ending x5838 in the name of Economic Strategist Master Trust.

110. On or about October 3, 2018, **MacDonald** caused EINs to be registered with the IRS for three Abusive Trusts on behalf of T.L.

111. On or after October 3, 2018, **MacDonald** caused T.L. to receive trust agreements for the Abusive Trusts. **Duren** served as the grantor of one of these sham trusts, T.L. Trust-1, and an employee of Economic Strategist served as the grantor for another, T.L. Trust-2. The Abusive Trusts were backdated to January 2, 2017.

112. On or about October 10, 2018, **Weickgenant** instructed T.L. to wait to file his 2017 Form 1040 until after **Weickgenant** had the opportunity to make changes to the return to fraudulently reduce T.L.'s tax liability using the backdated Abusive Trusts.

113. Between October 10 and 29, 2018, T.L. paid **Weickgenant** a total of $6,000 in two $3,000 installments to prepare T.L.'s 2017 Form 1040.

114. On or about October 15, 2018, **Weickgenant** prepared and filed T.L.'s 2017 Form 1040, which claimed a $91,356 refund based on the backdated Abusive Trusts.

115. On or about March 6, 2019, after receiving notice from T.L.'s attorney that the Abusive Trust was illegal, Conspirator-1 emailed a copy of a letter to T.L. for **MacDonald's** review that purported to justify the backdating of T.L.'s Abusive Trusts to 2017:

> At your request, I composed an explanation of the events that you relayed to me in reference to the three (3) trusts that you established on January 2, 2017. The fact that you applied for an EIN almost a year later and had the business trust book notarized more than a year later has nothing to do with the fact that the trusts were established on the date you stated and were in fact valid trusts at that time. … Your records clearly indicate that your conveyances to the trust and management agreements in place were not accounted for in 2017, which was the purpose of you amending the returns.

116. On or about March 7, 2019, Conspirator-1 emailed T.L. to advise him on terminating the services of T.L.'s attorney, who considered the Abusive Trusts illegal: "You can call and tell him that you want to terminate. You understand that he feels the structure is non compliant based on some incorrect information and statements that you relayed to him previously, but you stand confident that everything is compliant and the

PLR will confirm that."

117. On or about January 7, 2020, after Employee-1 notified **MacDonald** that an IRS attorney with the Office of Chief Counsel considered the Abusive Trust described in T.L.'s PLR to be taxable, Employee-1 emailed **MacDonald** a rough draft of an email to T.L. that attempted to explain away the IRS's determination.

Later Clients

118. On or about April 26, 2022, **MacDonald** communicated with client V.H. over an end-to-end encrypted messaging platform to promote the Abusive Trusts.

119. On or about April 28, 2022, **MacDonald** caused V.H. to wire $27,500 to an account ending x3889 in the name of Private Asset Services for the purchase of Abusive Trusts.

120. On or about September 8, 2022—approximately a month after IRS-CI special agents had executed a search warrant at **MacDonald's** residence and interviewed him about his promotion of the Abusive Trusts—**MacDonald** spoke with client B.S. to promote the Abusive Trusts over an end-to-end encrypted messaging platform.

121. On or about November 7, 2022, **MacDonald** caused B.S. to wire $105,000 to an account ending x3889 in the name of Private Asset Services for the purchase of Abusive Trusts.

122. On or about September 30, 2025, Preparer-1, a CPA to whom **MacDonald** referred clients of the Abusive Trusts, prepared and filed B.S.'s 2025 Form 1040, which claimed a $120,000 loss from a "management fee" purportedly paid to B.S.'s Abusive Trust.

Deflecting Criticism of the Abusive Trusts

123. On or about March 1, 2019, following criticism of the Abusive Trusts from independent professional advisors, **MacDonald** emailed **Cayce**, **Duren**, and others and proposed changes to the legal disclaimer on Economic Strategist's website. **MacDonald's** proposed disclaimer included the following: "Economic Strategists [*sic*] utilizes licensed attorneys and IRS Enrolled Agents who are the only one's [*sic*] authorized to provide legal, business, and or tax advice specific to the copyrighted non-grantor spendthrift instruments." This proposal was intended to replace language that encouraged prospective clients to consult their own attorney.

124. On or about December 5, 2019, **Cayce** emailed **MacDonald** regarding **Cayce**'s discussions with Attorney-1, an attorney who had previously been employed by Economic Strategist. **Cayce** wrote:

> [Attorney-1] is of the opinion that due to the fact the way we do business makes the Trust a "Grantor" Trust and this is wrong [*sic*]. He cannot be convinced otherwise, I tired [*sic*]. If this message circulates in your group it will greatly damage your organization. He needs to keep his opinions to himself and not let it proliferate through your company. We have done business the way we have it set up for 30 years with no problems at all, not even once. You should be very careful about spreading this or it will do damage you cannot repair. No Distributor we have must ever hear of this at all; please see to it and put an end to it immediately. This email is for your eyes only not to be shown to any; for your information and use to protect what you have built up; his opinion could destroy the attitude and thinking of all your associates. Please let me know that you will handle this.

125. On or about January 3, 2019, **MacDonald** responded to a sales representative regarding criticism of the Abusive Trusts, copying **Duren** and **Weickgenant**: "[The attorney's] lack of knowledge is common with many general

attorneys who are not properly schooled in the specific provisions within the instrument. Much is the same with 98% of all general CPA's [*sic*] who are also not knowledgeable with the 600 and 700 series of the Internal Revenue Code[.]"

126. On or about February 22, 2019, **Cayce** responded to a dual attorney–CPA, who had warned about the Abusive Trusts, copying **MacDonald**: "Obviously your attorney is not familiar with Rule 643 of the IRC. … Also Scott on Trust Law, the Restatement of Trusts and the IRC are very necessary to understand Trusts and their legal operations which I sincerely doubt this lawyer has take[n] the time to read and study."

127. On or about December 10, 2019, **MacDonald** emailed the sales representative for a group of prospective clients, whose CPA had raised questions about the Abusive Trusts: "[I]t did NOT appear to me, nor would it appear to literally everyone on the call that their 'Tax/Business Consultant' named Joe was allowing for a professional call to happen. … However, it was obvious especially with Joe being a CPA/Tax-Business Consultant was choosing NOT to understand something so remedial." **MacDonald** went on to say: "There is no way I could see how their Tax/Business Consultant would allow you/us to replace his income." **Cayce** responded to **MacDonald's** email congratulating him on an "[e]xcellent response."

128. Beginning on or about February 4, 2019, and continuing through at least September 2020, **MacDonald** and **Duren** hired a company to remove negative information about **MacDonald** and Economic Strategist from the internet, including information posted by client R.S. about his IRS audit and information about **MacDonald's** prior fraud conviction.

Payments to Benson Financial/Masters Copyrights for the Abusive Trusts

129. On or about July 30, 2017, **MacDonald** and **Cayce** signed a "Distributor Agreement" between Economic Strategist and Masters Copyrights for Economic Strategist to sell the Abusive Trusts. The agreement provided that Economic Strategist would pay Masters Copyrights a fee for each Abusive Trust sold.

130. On or about June 3, 2019, pursuant to the Distributor Agreement, **Duren** emailed **Cayce**, copying **MacDonald**, to report that she had wired $33,000 to Benson Financial to pay for the prior week's order of Abusive Trusts.

131. On or about the following dates, Economic Strategist dba Asset Cushion and, later, Private Asset Services and Smarte Holdings, made the following additional payments, among others, to Benson Financial a/k/a Masters Copyrights for the sale of Abusive Trusts:

| Overt Act | Date | Amount | Payor Account | Method of Payment |
|---|---|---|---|---|
| a | 12/1/2017 | $11,500 | Economic Strategists Trust x3367 | Wire |
| b | 2/23/2018 | $17,500 | Economic Strategists Trust x3367 | Wire |
| c | 6/4/2018 | $25,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| d | 7/27/2018 | $29,500 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| e | 8/17/2018 | $39,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| f | 10/12/2018 | $27,500 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| g | 10/19/2018 | $29,500 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| h | 11/30/2018 | $31,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| i | 12/7/2018 | $36,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| j | 12/26/2018 | $31,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| k | 1/4/2019 | $41,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| l | 2/4/2019 | $31,500 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| m | 2/22/2019 | $29,500 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| n | 3/4/2019 | $29,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| o | 3/15/2019 | $29,000 | Economic Strategist Master Trust x5838 | Wire by **Duren** |
| p | 6/24/2019 | $29,000 | Asset Cushion x2224 | Wire |
| q | 7/26/2019 | $32,500 | Asset Cushion x2224 | Wire |
| r | 8/2/2019 | $38,500 | Asset Cushion x2224 | Check |

| | | | | |
|---|---|---|---|---|
| **s** | 9/20/2019 | $35,000 | Asset Cushion x2224 | Check |
| **t** | 9/27/2019 | $33,000 | Asset Cushion x2224 | Check |
| **u** | 12/13/2019 | $22,500 | Asset Cushion x2224 | Wire |
| **v** | 1/10/2020 | $18,000 | Private Asset Services x3889 | Check signed by **Duren** |
| **w** | 5/15/2020 | $29,500 | Asset Cushion x2224 | Wire |
| **x** | 5/29/2020 | $7,500 | Private Asset Services x3889 | Check signed by **Duren** |
| **y** | 5/7/2021 | $22,000 | Private Asset Services x3889 | Check |
| **z** | 11/17/2021 | $46,500 | Private Asset Services x3889 | Check |
| **aa** | 11/24/2021 | $36,500 | Private Asset Services x3889 | Check |
| **bb** | 12/3/2021 | $31,500 | Private Asset Services x3889 | Check |
| **cc** | 3/11/2022 | $31,500 | Private Asset Services x3889 | Check |
| **dd** | 9/2/2022 | $12,000 | Smarte Holdings x0614 | Check |
| **ee** | 9/2/2022 | $15,000 | Private Asset Services x3889 | Check |
| **ff** | 9/16/2022 | $15,000 | Private Asset Services x3889 | Check |
| **gg** | 11/4/2022 | $9,000 | Smarte Holdings x0614 | Check |
| **hh** | 11/18/2022 | $15,000 | Private Asset Services x3889 | Check |
| **ii** | 1/27/2023 | $9,000 | Private Asset Services x3889 | Check |
| **jj** | 8/1/2024 | $9,000 | Private Asset Services x2743 | Wire |
| **kk** | 11/15/2024 | $25,000 | Private Asset Services x2743 | Wire |
| **ll** | 11/18/2024 | $6,500 | Private Asset Services x2743 | Wire |

In total, Benson Financial a/k/a Masters Copyrights received approximately $2.4 million from Economic Strategist, Private Asset Services, and Smarte Holdings between 2017 and 2024. A portion of those funds were transferred to an account ending x9378 in the name of The Masters Spendthrift Trust, on which **Cayce** was an authorized signer.

All in violation of Title 18, United States Code, Section 371.

Counts Two through Six
Aiding and Assisting in the Preparation of False Income Tax Returns
(Violation of 26 U.S.C. § 7206(2))

132. Paragraphs 1 through 35 and 38 through 131 of this Indictment are realleged and incorporated as if set forth fully herein.

133. On or about the dates set forth below, in the Northern District of Texas and elsewhere, defendants **MacDonald, Cayce**, and **Weickgenant** willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the IRS, of U.S. Income Tax Returns for Estates and Trusts, Forms 1041, for the taxpayers and calendar years set forth below, which were false and fraudulent as to a material matter in that the income tax returns deducted the full amount of income reported to the trust, when, as **MacDonald, Cayce**, and **Weickgenant** knew, the income could not be deducted:

| Count | Taxpayer | Form | Year | Approx. Filing Date | Falsity |
|---|---|---|---|---|---|
| **2** | J.D. Trust-2 | Form 1041 | 2019 | 11/18/2020 | Line 15a – Other deductions<br>Line 23 – Taxable Income |
| **3** | J.D. Trust-2 | Form 1041 | 2020 | 8/13/2021 | Line 15a – Other deductions<br>Line 23 – Taxable Income |
| **4** | J.D. Trust-2 | Form 1041 | 2021 | 10/06/2022 | Line 15a – Other deductions<br>Line 23 – Taxable Income |
| **5** | J.D. Trust-2 | Form 1041 | 2022 | 10/02/2023 | Line 8 – Other income<br>Line 15a – Other deductions<br>Line 23 – Taxable Income |
| **6** | J.D. Trust-2 | Form 1041 | 2023 | 9/30/2024 | Line 8 – Other income<br>Line 15a – Other deductions<br>Line 23 – Taxable Income |

All in violation of Title 26, United States Code, Section 7206(2).

Count Seven
Corrupt Interference with the Internal Revenue Laws
(Violation of 26 U.S.C. § 7212(a))

134. Paragraphs 1 through 35 and 38 through 131 of this Indictment are realleged and incorporated as if set forth fully herein.

135. On or about February 16, 2024, the IRS began an audit of the income tax returns for the trusts controlled by J.D., who was a client of the Abusive Trust scheme.

136. On or before March 29, 2024, **Weickgenant** learned that J.D. was under an IRS audit pertaining to the Abusive Trust scheme. **Weickgenant** faxed the IRS revenue agent handling the audit a Form 2848, Power of Attorney and Declaration of Representative, indicating that the IRS should communicate with him about the audit of the income tax returns for J.D.'s Abusive Trusts.

137. Beginning on or about March 29, 2024, and continuing through at least August 20, 2025, in the Northern District of Texas and elsewhere, defendant **Weickgenant** corruptly endeavored to obstruct and impede the due administration of the internal revenue laws by, among other actions, (1) dissuading client J.D. from lawfully responding to IRS summonses and (2) telling client J.D. not to appear for proceedings related to the IRS audit. Specifically:

a. On or about May 1, 2024, **Weickgenant** faxed a signed letter to an IRS revenue agent, who was auditing J.D.'s Abusive Trusts, claiming: "I have been advised by my legal advisors that I do not have the authority to discuss any items regarding this Spendthrift trust," and refusing to provide information regarding the trusts.

b. On or about May 14, 2024, **Weickgenant** emailed J.D. and

instructed him not to contact anyone from the IRS or speak with anyone from the IRS who may contact him.

c. On or about November 17, 2024, **Weickgenant** instructed J.D. by email that he did not need to attend a scheduled interview with the IRS, even though J.D. had received a summons from the IRS compelling his attendance and testimony.

In violation of Title 26, United States Code, Section 7212(a).

Counts Eight through Ten
Tax Evasion
(Violation of 26 U.S.C. § 7201)

138. Paragraphs 1 through 35 and 38 through 131 of this Indictment are realleged and incorporated as if set forth fully herein.

139. From in or about January 2019 through in or about August 2022, in the Northern District of Texas and elsewhere, defendant **MacDonald** willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the tax years 2019 through 2021, each year constituting a separate violation, by filing false Forms 1040, U.S. Individual Income Tax Returns, for those tax years, and by committing the following affirmative acts of evasion, among others:

a. Between 2019 and 2021, **MacDonald** attempted to conceal his ownership and control over Economic Strategist, Asset Cushion, and Private Asset Services by the use of straw owners and falsified employment documents.

b. Between 2019 and 2021, **MacDonald** used nominee trusts, including ES Master, ES Holdings, and Versailles Holdings, to conceal his receipt of income and his ownership of assets and to pay personal living expenses.

c. On or about August 2, 2022, MacDonald falsely told IRS-CI special agents that he was not an owner of Economic Strategist or Asset Cushion and falsely claimed that **Duren** was the owner.

d. On or about August 2, 2022, **MacDonald** falsely told IRS-CI special agents that income from his businesses was reported on corporate income tax returns.

All in violation of Title 26, United States Code, Section 7201.

Counts Eleven through Thirteen
Tax Evasion
(Violation of 26 U.S.C. § 7201)

140. Paragraphs 1 through 35 and 41 of this Indictment are realleged and incorporated as if set forth fully herein.

141. From in or about January 2019 through in or about August 2022, in the Northern District of Texas and elsewhere, defendant **Duren** willfully attempted to evade and defeat income tax due and owing by her to the United States of America, for the tax years 2019 through 2021, each year constituting a separate violation, by filing false Forms 1040, U.S. Individual Income Tax Returns, for those tax years, and by committing the following affirmative acts of evasion, among others:

a. Between 2019 and 2021, **Duren** used nominee trusts, including ES Master, ES Holdings, and Versailles Holdings, to conceal her receipt of income and her ownership of assets and to pay personal living expenses.

b. On or about August 2, 2022, **Duren** falsely told IRS-CI special agents that neither she nor **MacDonald** owned Economic Strategist or Asset Cushion and that she did not know who did.

All in violation of Title 26, United States Code, Section 7201.

Counts Fourteen through Fifteen
Tax Evasion
(Violation of 26 U.S.C. § 7201)

142. Paragraphs 1 through 35 and 38 through 131 of this Indictment are realleged and incorporated as if set forth fully herein.

143. During the tax years 2022 and 2023, defendants **MacDonald** and **Duren** received taxable income upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before the date that the return was required by law to be filed to any proper officer of the IRS, and to pay the income tax to the IRS, defendants **MacDonald** and **Duren**, from in or around January 2022 through in or around December 2023, in the Northern District of Texas and elsewhere, willfully attempted to evade and defeat income tax due and owing by them to the United States of America, for the tax years 2022 and 2023, each year constituting a separate violation, by committing the following affirmative acts of evasion, among others:

a. Between 2022 and 2023, **MacDonald** and **Duren** used nominee trusts, including ES Master, ES Holdings, Versailles Holdings, and NCD Holdings to conceal their receipt of income and their ownership of assets and to pay personal living expenses.

b. Between 2022 and 2023, **MacDonald** and **Duren** directed the payment of personal expenses through third-party accounts, including an attorney trust account, to conceal their receipt of income.

c. Between 2022 and 2023, **MacDonald** and **Duren** titled personal

assets in the name of nominee trusts, including Phoebe Royale Trust, to conceal their receipt of income.

All in violation of Title 26, United States Code, Section 7201.

Counts Sixteen through Nineteen
Making and Subscribing a False Tax Return
(Violation of 26 U.S.C. § 7206(1))

144. Paragraphs 1 through 35 and 38 through 131 of this Indictment are realleged and incorporated as if set forth fully herein.

145. On or about the dates set forth below, in the Northern District of Texas and elsewhere, defendant **Cayce** willfully made and subscribed and filed with the Internal Revenue Service the following materially false Forms 1040 for the tax years set forth below, which were verified by a written declaration that they were made under the penalties of perjury and which **Cayce** did not believe to be true and correct as to every material matter:

| Count | Form | Year | Approx. Filing Date | Falsity |
|---|---|---|---|---|
| **16** | Form 1040 | 2020 | 10/25/2021 | Schedule 1, Line 3 – Business Income<br>Line 9 – Total Income |
| **17** | Form 1040 | 2021 | 8/29/2022 | Schedule 1, Line 3 – Business Income<br>Line 9 – Total Income |
| **18** | Form 1040 | 2022 | 4/24/2023 | Schedule 1, Line 3 – Business Income<br>Line 9 – Total Income |
| **19** | Form 1040 | 2023 | 4/1/2024 | Schedule 1, Line 3 – Business Income<br>Line 9 – Total Income |

All in violation of Title 26, United States Code, Section 7206(1)

Counts Twenty through Twenty-One
Wire Fraud
(Violation of 18 U.S.C. § 1343)

146. Paragraphs 1 through 35 and 38 through 131 of this Indictment are realleged and incorporated as if set forth fully herein.

147. On or about August 8, 2013, **MacDonald**, his employees, and any agents acting on his behalf were permanently enjoined by court order from directly or indirectly soliciting or accepting funds from any person or entity for an offering of securities that was not registered with the Securities and Exchange Commission (SEC).

The Scheme to Defraud

148. Beginning in or around June 2022, and continuing to at least October 31, 2022, defendant **MacDonald**, knowingly and with the intent to defraud, devised and intended to devise a scheme to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

Manner and Means

149. The scheme to defraud operated, in substance, as follows:

a. Although he was prohibited by court order from selling unregistered securities, **MacDonald** solicited investor funds for purported investment opportunities called "SAFE Agreements," by which investors were purportedly offered the opportunity to purchase shares in Smarte Holdings, which offering **MacDonald** did not register with the SEC.

b. Despite representing to investors that Smarte Holdings was developing digital trusts, and despite promising investors guaranteed, lucrative returns,

**MacDonald** did not use any investor funds to develop digital trusts. Instead, **MacDonald** used the funds he took from investors to purchase luxury goods for himself.

c. **MacDonald** represented to investors that they could use the Abusive Trusts to avoid paying taxes on any profits made from the SAFE Agreements.

Use of the Wires

150. On or about of the dates set forth below, in the Northern District of Texas, and elsewhere, **MacDonald**, for the purpose of executing the fraudulent scheme described above, transmitted and caused the transmission by means of wire communication in interstate commerce the following writings, signs, signals, pictures, and sounds:

| Count | Date | Description of Wire |
|---|---|---|
| **20** | June 29, 2022 | $1,000,000 transfer via Fedwire from an Abusive Trust controlled by L.R. to Smarte Holdings account x2266 pursuant to a SAFE Agreement |
| **21** | October 31, 2022 | $1,000,000 transfer via Fedwire from an abusive Trust controlled by V.H. to Smarte Holdings account x2266 pursuant to a SAFE Agreement |

All in violation of Title 18, United States Code, Section 1343.

<u>Counts Twenty-Two through Twenty-Four</u>
Monetary Transactions with Criminally Derived Property
(Violation of 18 U.S.C. § 1957)

151. Paragraphs 1 through 35 and 38 through 131 of this Indictment are realleged and incorporated as if set forth fully herein.

152. On or about the dates set forth below, in the Northern District of Texas and elsewhere, defendant **MacDonald** knowingly engaged in the following monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343:

| Count | Date | Description of Monetary Transaction |
|---|---|---|
| **22** | 11/1/2022 | $781,168.49 transfer from Smarte Holdings account x2266 to attorney trust account x0207 |
| **23** | 11/1/2022 | $256,168.49 wire from attorney trust account x0207 for the purchase of a 2021 Rolls Royce Ghost (below)  |

| | | |
|---|---|---|
| **24** | 11/3/2022 | $500,000 wire from attorney trust account x0207 for a downpayment on an Ocean Alexander 28E yacht (below)<br> |

All in violation of Title 18, United States Code, Sections 1957.

Forfeiture Notice
(18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 982(a)(1); 26 U.S.C. § 7301; 26 U.S.C. § 7302; and 28 U.S.C. § 2461(c))

Upon conviction of the offenses in violation of Title 26, United States Code, Sections 7201, 7206, or 7212 as set forth in Counts Two through Nineteen of this Indictment, defendants **Duncan John MacDonald**, **Sarah Duren**, **Richard Ronald Cayce**, and **Thomas Weickgenant** shall forfeit to the United States of America, pursuant to Title 26, United States Code, Sections 7301 and 7302 and Title 28, United States Code, Section 2461(c), any property used or intended to be used in violating the provisions of the internal revenue laws or regulations as well as any property on which any tax is imposed by Title 26 which is in the possession, custody, or control of the defendant with design to avoid payment of such tax or with intent to defraud the United States of such tax or any part thereof.

Upon conviction of the offense in violation of Title 18, United States Code, Section 1343 as set forth in Counts Twenty through Twenty-One of this Indictment, defendant **Duncan John MacDonald** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 as set forth in Counts Twenty-Two through Twenty-Four of this Indictment, defendant **Duncan John MacDonald** shall forfeit to the United States of America,

pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), if, by any act or omission of the defendant, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United

States of America intends to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above as substitute property.

A TRUE BILL

GRAND JURY FOREPERSON

RYAN RAYBOULD
UNITED STATES ATTORNEY

COLIN M. MCDONALD
ASSISTANT ATTORNEY GENERAL
NATIONAL FRAUD ENFORCEMENT DIVISION

WILLAM MONTAGUE
Acting Assistant Deputy Chief
Virginia State Bar No. 89425
MAX WILLNER-GIWERC
Trial Attorney
District of Columbia Bar No. 90027905
National Fraud Enforcement Division, Tax Section
ERIC CHEN
Assistant United States Attorney
Texas State Bar No. 24094587
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 817-252-5281
Facsimile: 214-659-8809
William.M.Montague@usdoj.gov
Max.Willner-Giwerc@usdoj.gov
Eric.Chen@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

THE UNITED STATES OF AMERICA

v.

DUNCAN JOHN MACDONALD (01)
a.k.a. Duncan John
a.k.a. DJ
SARAH DUREN (02)
RICHARD RONALD CAYCE (03)
a.k.a. Richard Ronald
THOMAS WEICKGENANT (04)

---

SEALED INDICTMENT

18 U.S.C. § 371
Conspiracy to Defraud the United States
(Count 1)

26 U.S.C. § 7206(2)
Aiding and Assisting in the Preparation of False Income Tax Returns
(Counts 2-6)

26 U.S.C. § 7212(a)
Corrupt Interference with the Internal Revenue Laws
(Count 7)

26 U.S.C. § 7201
Tax Evasion
(Counts 8-15)

26 U.S.C. § 7206(1)
Making and Subscribing a False Tax Return
(Counts 16-19)

18 U.S.C. § 1343
Wire Fraud
(Counts 20-21)

18 U.S.C. § 1957
Monetary Transactions with Criminally Derived Property
(Counts 22-24)

18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 982(a)(1); 26 U.S.C. § 7301; 26 U.S.C. § 7302; and 28 U.S.C. § 2461(c)
Forfeiture Notice

24 Counts

---

A true bill rendered

---

DALLAS FOREPERSON

Filed in open court this 23rd day of September, 2026.

---

**Warrant to be Issued for all Defendants**

---

UNITED STATES MAGISTRATE JUDGE
Criminal Case Pending: